## PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1897**

---

JAIME DANIEL NAVARRO CERRITOS,

       Petitioner,

   v.

TODD BLANCHE, Attorney General,

       Respondent.

----------------------------------------

NATIONAL IMMIGRATION LITIGATION ALLIANCE

       Amicus Supporting Petitioner.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued: May 6, 2026                    Decided: August 11, 2026

---

Before WILKINSON, KING, and GREGORY, Circuit Judges.

---

Petition for review granted, reversed in part, vacated in part, and remanded for further proceedings by published opinion. Judge Gregory wrote the opinion, in which Judge King joined. Judge Wilkinson wrote a dissenting opinion.

---

**ARGUED:** McKenzie Stoker, Andrew Porter, AMERICAN UNIVERSITY, Washington, D.C., for Petitioner. Christopher Ian Pryby, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jayesh Maneklal Rathod, Immigrant Justice Center, AMERICAN UNIVERSITY, Washington, D.C., for Petitioner. Brett A. Shumate, Assistant Attorney General, Anthony C. Payne, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

GREGORY, Circuit Judge:

Jaime Daniel Navarro Cerritos ("Navarro") first entered the United States in 2013, fleeing the brutality of the MS-13 gang in El Salvador. After he was deported back to El Salvador, where he faced continued threats of violence and death, he again escaped to the United States for refuge. In April 2021, the Department of Homeland Security ("DHS") reinstated Navarro's initial removal order from 2016. Navarro conceded removability but sought withholding and relief under the Convention Against Torture ("CAT"). The IJ denied his requests, and the Board of Immigration Appeals ("Board") dismissed his appeal. Thirty days after the Board issued its decision, Navarro petitioned this Court for review of the Board's decision.

In light of the Supreme Court's recent decision in *Riley v. Bondi*, 606 U.S. 259 (2025), the Government contends that we lack jurisdiction to review Navarro's petition, or, in the alternative, that Navarro's petition was untimely under 8 U.S.C. § 1252(b)(1) because it was filed more than thirty days after DHS issued the "final order of removal" in his case. The Government also argues that Navarro's claims fail on the merits, requiring affirmance of the Board's decision.

We hold that we have jurisdiction to review Navarro's untimely petition, and we equitably toll 8 U.S.C. § 1252(b)(1)'s 30-day deadline as applied to Navarro's case. We therefore deny the Government's motion to dismiss for lack of subject-matter jurisdiction. We also agree with Navarro's arguments on the merits, so we grant Navarro's petition, vacate the Board's ruling, and remand for further proceedings.

I.

Navarro was born in El Salvador, in a town with a ubiquitous MS-13 presence. He grew up next to the leader of the town's MS-13 clique, so gang members were present throughout his childhood. For example, when Navarro was nine, he saw Lolo, a member of the gang, "hacking and slicing" a man with a machete. J.A. 843. Navarro and his aunt fled, but Lolo—covered in blood—found them and "stared at [them] for a moment and then silently shushed [them]." J.A. 843. Another individual was arrested, tried, and convicted for the murder Navarro witnessed; Navarro and his aunt never spoke up.

That was not the only crime Navarro witnessed. The next year, when Navarro was going to his grandmother's house, he saw MS-13 members raping two girls. J.A. 844–45. They asked Navarro if he saw anything, and he stated that he did not. The men beat him anyway to make sure he did not talk. One man punched him in the face, another punched him in the abdomen, and another pushed him into the creek. Navarro was afraid to tell his aunt what happened, but he eventually told her about the incident. Against Navarro's wishes, his aunt told him she was going to report the attack and threats to the police. But, although she did report the incident to the police, and the police said they would come take a full incident report, they never came. Instead, they notified MS-13 that Navarro's aunt had made the report.

Navarro was frequently harassed for refusing to join MS-13. When Navarro was ten years old, he was walking home when a group of gang members approached him and tried to persuade him to join MS-13. He refused. They continued to harass him, then foreshadowed their next tactic: "since you think you're too good to join us let's see if this

3

changes your mind." J.A. 844. Then, they punched him, kicked him, and dislocated his wrist. Navarro did not tell anyone that he was attacked by the gang. When asked about his cuts and injured wrist, he stated that he had gotten into a fight at school.

In another instance, Navarro was walking through a desolate area on the way to his grandfather's house when he encountered Calavera, the leader of the local MS-13 group, and other MS-13 members. They called him a "rat," told him he "hadn't learned [his] lesson," and said "they would make sure [he] stayed quiet this time." J.A. 846. Navarro believes the gang members were referencing the police report his aunt made. They took off his shorts and boxers and punched, kicked, and raped him. J.A. 847. During the attack, Navarro passed out. When he awoke, his shoulder was in pain from being held down so long, and he could not move his arm. But he eventually got up, put his shorts on, and went home. He told his family members not to contact the police.

A month later, Navarro left El Salvador; his family realized that he needed to leave in order to survive. He fled to the United States and lived a normal life with his family in Virginia. He applied for asylum soon after arriving, but his application was denied and he was given a voluntary departure order. He then applied for DACA relief, which was approved in 2013 and 2014, but not in 2016. In April 2016, after Navarro was pulled over for a traffic citation, ICE became aware of his unlawful presence and deported him.

Once deported, Navarro again began to fear he would be killed. His neighbor's son was murdered soon after he arrived, so Navarro tried not to leave his house. J.A. 849–50. He later bumped into Calavera, who asked Navarro to take him out to drinks. This

happened often; Navarro repeatedly refused. A month later, after one such refusal, he received another brutal beating from the gang members.

Despite this torment, Navarro, his brother Narciso, and his cousin Maritza, founded a committee to create alternatives for young people who may feel compelled to join MS-13. He took the children night fishing, helped them find part-time employment, played soccer with them, tutored them, and drove them to school. Soon after he started this organization, MS-13 members approached Navarro with a gun. They told him to join the gang to avoid any harassment. But when he refused, they threw Navarro on the ground and spat on him. J.A. 850–51. MS-13 members also began referring to Navarro as a "shepherd," used derogatorily to reference Navarro's anti-gang activities. J.A. 850; J.A. 555.

Navarro's involvement as Vice President of the youth committee amplified his status as an MS-13 target. When Jose Vallecillos, a wealthy landowner with ties to MS-13, reneged on his promise to donate land to the committee, it was Navarro who confronted him, argued with him, and then publicly repudiated his actions. In retaliation, Vallecillos asked MS-13 to threaten Navarro, and they told Navarro that he "had not learned his lesson" before. J.A. 856. Calavera confronted Navarro, telling him that he would "end up under one of the dirt piles" if he continued in his attempts to retrieve the land. J.A. 855. Calavera threatened, "[d]idn't you learn your lesson the first time? You know what happens when you don't comply, but this time we'll make sure you don't come back." J.A. 855. Fearing reprisal, Navarro's anti-gang committee disbanded soon after, and Navarro relocated to Chalatenango to "avoid being killed by Calavera." J.A. 855. Chalatenango had a strong government and military presence, so Navarro believed he would be safer there.

5

Navarro returned to San Nicolas around Christmas to visit his grandmother. On Christmas Eve of 2016, Calavera was killed. Navarro returned to Chalatenango two days later. Sensing an opportunity to scapegoat a community annoyance, the new MS-13 leader started a rumor that Navarro had killed Calavera. Navarro learned of the rumor from his brother, who warned Navarro to stay away because MS-13 was looking for him and watching his grandmother's house. But it was not long before MS-13 located Navarro and began asking Navarro's coworkers about him. Navarro moved to a new city, Jucuapa, but the MS-13 presence there was even worse. Navarro made a third attempt to relocate to Jocurro, a city an hour from Jucuapa. Yet, inquisitive gang members appeared wherever he went: his hosts in Jocurro said they were threatened by gang members because Navarro was staying with them. Because the MS-13 members were aware of his presence in Jocurro, he was worried that the MS-13 clique in San Nicolas would soon learn where he was hiding. He finally decided to leave El Salvador, believing that if he stayed, he would be killed.

He returned to the United States in July or August of 2017, but he was soon placed in ICE custody again. J.A. 858. Navarro's brother conveyed a message from MS-13; the gang was aware that he would be deported to El Salvador shortly and stated that Navarro's return "would not be tolerated" because of the problems Navarro had caused. J.A. 858.

## II.

Navarro was apprehended by DHS in Virginia, and his prior removal order was reinstated on April 2, 2021. On July 27, 2021, an IJ, overturning an asylum officer's determination, placed Navarro in withholding-only proceedings. J.A. 137.

After a hearing, the IJ denied Navarro's application for withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and CAT protection. Navarro timely appealed the IJ's determination to the Board, which dismissed his appeal in part and remanded to the IJ in part.

The IJ issued a second decision in February 2023, again denying Navarro withholding and CAT relief. The IJ found Navarro credible and determined that he provided sufficient corroboration for his factual allegations, including that Navarro founded a youth committee and was blamed for Calavera's death. But the IJ nonetheless determined that Navarro failed to demonstrate eligibility for withholding of removal because his proposed particularized social group ("PSG"), "Individuals in El Salvador Who Witness and Report Crimes by MS-13 to the Police," was not cognizable. The IJ held that even if Navarro was an imputed member of his proposed PSG, the group was not sufficiently particular because the term "witness" is not particular. And it found that the articulated group was likewise not socially distinct, because society as a whole, rather than Navarro's perpetrators, must perceive a group as distinct.[1]

Next, the IJ found that Navarro failed to demonstrate that he suffered harm due to his actual or imputed anti-gang political opinion. The IJ determined that Navarro's work with children would not be perceived by MS-13 as evincing an actual or imputed anti-gang political opinion. It also found that Navarro's altercation with Vallecillos was "a central reason" for the threats he suffered. J.A. 145–46. In addition, the IJ credited Navarro's recounting of the rumor that he killed Calavera and found the rumor corroborated by

---

[1] The IJ found that Navarro was not a member of his proposed PSG but assumed *arguendo* that Navarro was an imputed member of his proposed PSG. J.A. 163.

7

Navarro's brother's affidavit. But the IJ nonetheless found it unlikely that MS-13 imputed an anti-gang political opinion on Navarro based on that rumor because Navarro's family has reportedly remained unharmed. J.A. 146.

Finally, the IJ determined that Navarro failed to demonstrate his eligibility for protection under CAT. It determined that Navarro does not face a particularized risk of torture by Vallecillos or MS-13 if removed to El Salvador. The IJ found Navarro's claim that he will be tortured or killed upon arrival to be "speculative" because Navarro's family did not describe communications they received from MS-13 after Navarro's departure. J.A. 167. The IJ likewise determined that Navarro did not prove relocation in El Salvador was untenable. And it concluded that even if Navarro had demonstrated a particularized risk of torture upon his return to El Salvador, the record did not show that the government would acquiesce to such torture. So, the IJ denied relief on all grounds.

Navarro timely appealed the IJ's determination to the Board. On July 28, 2023, in a single-member opinion, the Board affirmed the IJ's decision in full. The Board agreed that Navarro's proposed PSG was not cognizable because it lacked particularity and social distinction. With respect to Navarro's political opinion claim, the Board found that Navarro failed to establish that he "held or expressed any anti-gang political opinion, that the gang targeted him because it perceived him as a political threat, or that it would target him for such belief imputed to him." J.A. 6. It therefore affirmed the IJ's denial of withholding of removal relief.

The Board also affirmed the IJ's denial of protection under CAT, agreeing that the risk of Vallecillos continuing to pursue Navarro was "low," and the risk of MS-13 seeking

8

to torture or kill Navarro was "speculative." J.A. 8. In addition, the Board did not disturb the IJ's determination that Navarro failed to demonstrate he was unable to safely relocate elsewhere in El Salvador.

Navarro was removed to El Salvador in August 2023. He petitioned this Court for review on August 28, 2023.

## III.

Before addressing the timeliness of Navarro's petition, we must determine whether we have jurisdiction to consider his petition at all. "A federal court must always satisfy itself that it has jurisdiction." *Riley*, 606 U.S. at 273. "Thus, even if the parties fail to spot a jurisdictional issue or agree that the court has jurisdiction, the court cannot proceed unless it makes an independent determination that it has jurisdiction." *Id.*

8 U.S.C. § 1252(a)(1) allows noncitizens to petition for judicial review of a "final order of removal." "[I]n the deportation context, a 'final order of removal' is a final order 'concluding that the alien is deportable or ordering deportation.'" *Nasrallah v. Barr*, 590 U.S. 573, 579 (2020) (quoting 8 U.S.C. § 1101(a)(47)(A)). Finding a noncitizen is entitled to CAT relief or statutory withholding "means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country." *Id.* at 582. In other words, because statutory withholding and CAT relief do not address the question of removability, a denial of either form of relief does not constitute a final order of removal. *See Riley*, 606 U.S. at 263 (holding that a Board order in a withholding-only proceeding is not a final order of removal).

We may still review CAT and withholding claims, but only if these claims accompany a final order of removal. The "zipper clause," 8 U.S.C. § 1252(b)(9), provides that judicial review of any "questions of law and fact" that arise in removal proceedings may occur "only in judicial review of a final order under this section." And 8 U.S.C. § 1252(a)(4) states that a petition for review filed with a court of appeals "shall be the sole and exclusive means for judicial review" of a CAT claim. *Riley* made clear that any challenge to the Board's denial of withholding and CAT relief must be tethered to a challenge to a final order of removal, because "review of removability and withholding of removal should occur in a single appellate proceeding." *Riley*, 606 U.S. at 271.

After conceding removability, Navarro petitioned to our court for review of the Board's determination as to statutory withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and CAT protection under 8 C.F.R. § 241.8(e). The question before us is whether Navarro's petition challenges a final order of removal under 8 U.S.C. § 1252(a)(1), even though he does not challenge removability on the merits. If it does, we have jurisdiction to review his petition.

## A.

First, what order constitutes the "final order of removal" in the case before us? Our precedents suggest that reinstatement orders constitute orders of removal under § 1252(a)(1), though we have never definitively answered that question. *See Rivas de Nolasco v. Bondi*, 150 F.4th 350, 355 (4th Cir. 2025) (treating reinstatement order as final order of removal).

10

Though the Government contends in its response brief that the reinstatement order in Navarro's case is not a final order of removal, the Government previously conceded that it was. *See* Gov't Mot. to Dismiss at 8–9 ("Here, though, Navaro Cerritos has not petitioned for review of a final order of removal – that is, he has not sought review of DHS's April 2, 2021 reinstatement order."). And the Government likewise acknowledged in its response brief that courts of appeals have "unanimously" reviewed petitions for review of reinstatement orders. Resp. Br. at 20.

We see no reason to depart from the weight of authority. We hold that reinstatement orders constitute final orders of removal under § 1252(a)(1). In *Riley*, the Supreme Court recognized that the order concluding Riley was deportable and "commanding his deportation" was the Final Administrative Removal Order ("FARO") issued by DHS. 606 U.S. at 267.[2] The Court recognized that, per statute, an order of removal becomes final after either "(1) 'a determination by the [Board] affirming such order,' or (2) 'the expiration of the period in which the alien is permitted to' petition the Board for review of the order." *Id.* (citing § 1101(a)(47)(B)). Because Riley could not appeal the FARO before an IJ or the Board, "the period to seek review expires as soon as the FARO is issued—meaning that the order becomes final immediately upon issuance." *Id.* (citation modified). Thus, the FARO issued in Riley's case constituted the final order of removal in that case.

---

[2] The term "FARO" comes from 8 C.F.R. § 238.1, which governs expedited removal of noncitizens facing deportation from the United States due to aggravated felony convictions. A FARO is distinct from a "final order of removal" as specified in 8 U.S.C. § 1252(a)(1).

11

For similar reasons, the April 2, 2021 reinstatement of Navarro's prior removal order is the relevant final order of removal in this case. *See* J.A. 1484 (reinstating the May 6, 2016 order of removal). Like a FARO, the regulations governing reinstatement orders prescribe no process by which the reinstatement of a prior removal order may be appealed. It becomes final upon its issuance.

In so holding, we join our sister circuits, which have unanimously exercised jurisdiction over reinstatement orders. *See Arevalo v. Ashcroft*, 344 F.3d 1, 9 (1st Cir. 2003); *Laureano v. Att'y Gen.*, 177 F.4th 453, 457 (3d Cir. 2026); *Garcia v. Holder*, 756 F.3d 885, 890 (5th Cir. 2014); *Moreno-Martinez v. Barr*, 932 F.3d 461, 463 (6th Cir. 2019); *E.E.V. v. Blanche*, 180 F.4th 954, 967 (7th Cir. 2026); *Lara-Nieto v. Barr*, 945 F.3d 1054, 1059 (8th Cir. 2019); *Ruiz v. Bondi*, 172 F.4th 673, 676 (9th Cir. 2026); *Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1139 (10th Cir. 2023), *abrogated on other grounds by Riley*, 606 U.S. at 259; *Avila v. U.S. Att'y Gen.*, 560 F.3d 1281, 1284 (11th Cir. 2009).

## B.

Next, what constitutes a "challenge" to a final order of removal? Specifically, must a petitioner challenge removability in order to challenge a final order of removal? *Riley* did not address this question. Before the Supreme Court decided *Riley*, the Second Circuit stated that courts can only review CAT claims when they accompany a "judicially reviewable final order of removal." *See Bhaktibhai-Patel v. Garland*, 32 F.4th 180, 190 n.13 (2d Cir. 2022), *abrogated on other grounds by Riley v. Bondi*, 606 U.S. 259 (2025). And since *Riley*, the Third, Seventh, Ninth, and Eleventh Circuits have weighed in, though they have reached diverging conclusions. *See Laureano*, 177 F.4th at 453 (finding

12

jurisdiction to review a CAT claim where petition did not expressly challenge removability); *E.E.V.*, 180 F.4th at 970–72 (in dicta, noting that "*Riley* clearly requires a would-be petitioner to file a petition for review of a final order of removal, not from the denial of withholding-only relief," but holding that judicial review does not require a "substantive challenge" to removability); *Navarrete v. Bondi*, 170 F.4th 1214, 1221 (9th Cir. 2026) (no jurisdiction to review CAT claim because petition did not expressly challenge removability); *Hayles v. U.S. Att'y Gen.*, 179 F.4th 872, 875 (11th Cir. 2026) (same).

We join the Third Circuit today in holding that we have jurisdiction to review a petition for review that does not expressly challenge removability. As the Third Circuit recognized in *Laureano*, *Riley* itself directs us to assert jurisdiction over Navarro's petition. *See Laureano*, 177 F.4th at 457–59. Riley, like Navarro, conceded removability but sought to challenge the Board's denial of his CAT and withholding of removal claims. The Supreme Court was obligated to dismiss Riley's petition if it found it lacked jurisdiction. *See Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (recognizing that courts must address all jurisdictional bars before remanding a case to lower courts); *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 274 (2022) (stating that the Supreme Court must "assure" itself that all "jurisdictional requirements" are "met" in the cases that come before it). As the *Riley* majority noted, "a litigant's failure to comply with a jurisdictional bar deprives a court of all authority to hear a case, regardless of waiver or equitable considerations." *Riley*, 606 U.S. at 273 (citing 33 C. Wright & A. Miller, *Federal Practice and Procedure* § 8316 (2018)). And, because of Justice Thomas's concurrence, the Court was aware of a potential jurisdictional defect. *See id.* at 278 (Thomas, J., concurring).

13

Although the Court did not provide a full analysis of the jurisdictional issue, it noted that petitioners like Riley, who have conceded removability but have yet to receive a withholding-only relief decision, need not fear being deprived of judicial review so long as timeliness poses no barrier to their petition. *Id.* at 272. If Riley were deprived of jurisdiction because he failed to expressly challenge his underlying petition for removal, such an outcome would surely conflict with the Supreme Court's assurance that he would "not be hurt" and unable to have his petition reviewed. *Id.* Like the Third Circuit, we find this discussion further bodes in favor of our jurisdiction. *See Laureano*, 177 F.4th at 458 ("[T]he Supreme Court had no doubt that courts of appeals have jurisdiction to review withholding-only rulings independent of any substantive review of final orders of removal.").

Moreover, when a petition for review fails to specify the order being challenged, precedent counsels a functional approach. In his petition for review to this Court, filed August 28, 2023, Navarro stated that he was appealing the Board's July 28, 2023 decision because it was the "final order of removal" in his case. Pet. at 1. Navarro's petition references the 2021 reinstatement of his prior removal order. *Id.* His petition does not, however, expressly challenge the reinstatement order constituting the final order of removal in his case. But Navarro's "inexact specification" that the order to be reviewed is the 2023 denial of withholding-only relief, rather than the 2021 reinstatement order, does not foreclose us from reviewing his petition. *Am. Rivers v. FERC*, 895 F.3d 32, 44 (D.C. Cir. 2018).

Federal Rule of Appellate Procedure 3(c)(1)(B) imposes requirements on litigants petitioning to a court of appeals: the notice must "designate the judgment–or the appealable order–from which the appeal is taken." The Supreme Court has instructed that "'functional'

14

rather than formalistic compliance" with Rule 3 "is all that is required." *Clark v. Cartledge*, 829 F.3d 303, 305 (4th Cir. 2016) (citing *Smith v. Barry*, 502 U.S. 244, 248 (1992)).

Federal Rule of Appellate Procedure 15(a)(2)(C) similarly requires that a petition for review "specify the order to be reviewed." We, in accord with our sister circuits, have construed Rule 15(a)(2)(C) with the same liberal approach the Supreme Court has mandated be applied to Rule 3(c)(1)(B). *See Gottesman v. Immigr. & Naturalization Serv.*, 33 F.3d 383, 388 (4th Cir. 1994) ("[W]e do not disturb the well-established principle that 'the requirements of the rules of procedure should be liberally construed and that mere technicalities should not stand in the way of consideration of a case on its merits.'") (quoting *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316 (1988)) (citation modified); *Castillo-Rodriguez v. Immigr. & Naturalization Serv.*, 929 F.2d 181, 184 (5th Cir. 1991); *Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 157–58 (D.C. Cir. 2002); *Village of Barrington v. Surface Transp. Bd.*, 892 F.3d 252, 266 (7th Cir. 2018); *Kazarian v. Bondi*, 159 F.4th 690, 692–93 (9th Cir. 2025). Such requirements "derive from the need to provide 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Perez-Perez v. Bondi*, 127 F.4th 1180, 1182 (9th Cir. 2025) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)).

For that reason, in the context of Rule 15(a)(2)(C), our sister circuits have repeatedly noted that "a mistaken or inexact specification of the order to be reviewed is not fatal, as long as the 'intent to seek review of a specific order . . . can be fairly inferred from the petition for review . . .' [and] the respondent is not misled by the mistake." *Am. Rivers*, 895

15

F.3d at 44 (citing *Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 312 (D.C. Cir. 2000));

*see Le v. Astrue*, 558 F.3d 1019, 1023 (9th Cir. 2009) (same).

In one such case, *Sinclair Broadcast Group, Inc.*, 284 F.3d at 156–158, a petition for review only expressly challenged an unreviewable reconsideration order, rather than an earlier order the petitioner intended to challenge.   But the D.C. Circuit nonetheless determined it had jurisdiction to review the petition for review because the petitioner's docketing statement "gave notice to a reasonably intelligent person that [petitioner] intended to make a substantive challenge to the underlying Local Ownership Order and not only to the Reconsideration Order."  *Id.* at 158.  The court "fairly read" a challenge stating that the FCC "acted arbitrarily, capriciously, and otherwise contrary to law in imposing the new local television ownership regulations on broadcasters" to refer to the underlying order the petitioner failed to name in its petition for review.  *Id.*

And the D.C. Circuit has exercised jurisdiction in several similar cases where the underlying order petitioner sought to appeal was not named at all.  *See Martin v. FERC*, 199 F.3d 1370, 1372–73 (D.C. Cir. 2000); *City of Oconto Falls v. FERC*, 204 F.3d 1154, 1160 (D.C. Cir. 2000).  In *City of Oconto Falls*, the court found it persuasive that the petitioner's briefs "addressed" the underlying order not named in its petition.  204 F.3d at 1160.

So too here:  Navarro's "inexact specification of the order to be removed is not fatal" to our review of his petition.  *Am. Rivers*, 895 F.3d at 44.  It can be "fairly inferred" that Navarro's petition, seeking review of the Board's denial of withholding-only relief, implicitly sought review of the underlying removability decision.  *Id.*  Navarro's petition referenced the 2021 reinstatement order and sought to challenge the "final order of

16

removal" in his case. Pet. at 1. His challenges to the Board's rulings on his withholding and CAT claims arise from the single proceeding that reinstatement of his prior removal order triggered. *See Riley*, 606 U.S. at 271 (noting that "review of removability and withholding of removal should occur in a single appellate proceeding"). And the Government has not claimed any prejudice, nor that it is somehow burdened by Navarro's failure to expressly challenge the reinstatement order.

To be sure, in many cases where the court has found an intent to seek review to be "fairly inferred," the petitioners submitted a statement of issues or reasons expressly listing its challenge to the agency's underlying order, and Navarro has not. *See Am. Rivers*, 895 F.3d at 44; *Sinclair*, 284 F.3d at 158; *Damsky v. FCC*, 199 F.3d 527, 532–34 (D.C. Cir. 2000). But, given the requirement that petitioners challenge removability "without also briefing meritless arguments against those orders," a fulsome challenge to the final order of removal in Navarro's case is particularly unnecessary. *Riley v. Blanche*, 180 F.4th 187, 195 (4th Cir. 2026) (hereinafter "*Riley II*"). After all, Navarro does not need any *actual* challenge to removability to preserve review of his withholding and CAT claims. *Riley* tells us quite the opposite: the Court envisioned "nominal challenges" to removability to ensure compliance with 1252(b)(1)'s 30-day filing requirement. *Id.* at 194. Such "placeholder appeal[s]" do not require the noncitizen to mount a merits challenge to removability—we recognized in *Riley II* that we simply require some indication that the petition challenges the final order of removal in a noncitizen's case. *Id*. at 193. For that reason, we granted Riley's request to amend his petition to include an express challenge to his initial removal order, even though Riley did not actually contest removability. *Id.* at

17

195. We are satisfied that Navarro's petition challenges the underlying final order of removal, supporting our exercise of jurisdiction.

The Government looks to *Entravision Holdings, LLC*, 202 F.3d at 312, where the D.C. Circuit held that the petitioner's intent to seek review of an underlying order was not fairly inferable from its filings. There, Entravision's contemporaneous filings "clearly demonstrate[d]" an intent to put *only* the unreviewable order before the court. *Id.* at 314. Entravision's petition for review mentioned the order it actually intended to challenge in passing, when recounting procedural history. *Id.* But *Entravision* is inapposite: Navarro's contemporaneous filings illustrate his intent to challenge the underlying removal order. As discussed above, when a petitioner has conceded removability, a petition to review the Board's denial of withholding of removal and CAT relief requires only a nominal challenge to the underlying final order of removal. Thus, Navarro's discussion of the reinstatement decision in his petition for review, along with his inclusion of both the reinstatement decision and his initial order of removal in his subsequent filings, allow us to "fairly infer" his intent to nominally challenge the underlying removability decision in his case.

In sum, we retain jurisdiction over Navarro's petition because his petition for review challenges the final order of removal in his case.

## IV.

Since we have jurisdiction over Navarro's petition, we must now determine whether timeliness poses a bar to his petition.

18

The Supreme Court clarified in *Riley v. Bondi* that the statutory deadline in § 1252(b)(1) is a "claims-processing rule" and not jurisdictional. 606 U.S. at 275. So Navarro urges us to determine whether § 1252(b)(1)'s 30-day filing rule may be equitably tolled. This is an open question, though the dissenting justices in *Riley* noted that equitable tolling is "likely available now that the Court has recognized that section 1252(b)(1)'s appeal deadline is not jurisdictional." 606 U.S. 302–03 (Sotomayor, J., dissenting).

Some post-*Riley* decisions have described § 1252(b)(1)'s 30-day deadline as a "mandatory" claims-processing rule, and therefore not subject to equitable tolling. *See Marroquin-Zanas v. Bondi*, No. 22-1122, 2025 WL 2694111, at *1 (4th Cir. Sept. 23, 2025); *Liao v. Bondi*, 162 F.4th 519, 524 (5th Cir. 2025); *Fuentes Aguilar De Perez v. Bondi*, No. 24-4605, 2025 WL 3657596, at *2 (9th Cir. Dec. 17, 2025).[3]

The Sixth Circuit was the first of our sister circuits to squarely address whether § 1252(b)(1) is subject to equitable tolling in a published opinion. *See Oxlaj-Perez v. Blanche*, 174 F.4th 516 (6th Cir. 2026). It determined that the "text, structure, and context" of § 1252(b)(1) did not rebut the presumption that the 30-day deadline is subject to equitable tolling. 174 F.4th at 526. The Seventh Circuit joined soon after, also holding that § 1252(b)(1)'s 30-day deadline is subject to equitable tolling. *E.E.V.*, 180 F.4th at 973. We join the Sixth and Seventh Circuits today and hold that § 1251(b)(1)'s 30-day deadline

---

[3] The characterization of § 1252(b)(1)'s 30-day deadline as "mandatory" does not automatically render it unsusceptible to equitable considerations. *See Fort Bend County v. Davis*, 587 U.S. 541, 549 n.5 (2019) (noting, after *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192 (2019), that "the Court has reserved whether mandatory claim-processing rules may ever be subject to equitable exceptions") (citation modified).

19

may be equitably tolled.  We then address whether the circumstances of Navarro's case warrant equitable tolling and hold that they do.

A.

The Supreme Court has "made clear that a nonjurisdictional federal statute of limitations is normally subject to a 'rebuttable presumption' in *favor* 'of equitable tolling.'" *Holland v. Florida*, 560 U.S. 631, 645–46 (2010) (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95–96 (1990) (emphasis in original)).  Equitable tolling is a "background principle against which Congress drafts limitations periods."  *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 208–09 (2022).  The presumption is rebutted only if tolling "would be 'inconsistent with the text of the relevant statute.'"  *Young v. United States*, 535 U.S. 43, 50 (2002) (quoting *United States v. Beggerly*, 524 U.S. 38, 48 (1998)).  When "the text of the [claim-processing] rule" does not "leave[] room for such flexibility," we consider it to be "mandatory."  *Nutraceutical Corp.*, 586 U.S. at 192.  In essence, we must ask whether "there [is] good reason to believe that Congress did *not* want the equitable tolling doctrine to apply."  *Arellano v. McDonough*, 598 U.S. 1, 7 (2023) (emphasis in original).

The Supreme Court recently applied the equitable tolling presumption to a 30-day deadline for filing a petition for review of a decision of the Internal Revenue Service's Independent Office of Appeals.  It determined that there was "nothing to rebut the presumption" of equitable tolling. *Boechler*, 596 U.S. at 209.  In doing so, it relied on factors including:  (1) the dearth of statutory text in the statute "expressly" prohibiting tolling; (2) the "short, 30-day" limitations period; (3) the fact that the deadline was directed at the claimant; and (4) the statute governed petitions often filed by "laymen." *Id.* at 209–10.

20

Following the Court's instructions, we begin by considering whether the "text, structure, and context" of § 1252(b)(1) rebut the presumption in favor of equitable tolling. *Enbridge Energy, LP v. Nessel*, 146 S. Ct. 1074, 1079 (2026). The text of § 1252(b)(1) is as follows:

> With respect to review of an order of removal under subsection (a)(1), the following requirements apply: The petition for review must be filed not later than 30 days after the date of the final order of removal.

The text of § 1252(b)(1) does not expressly permit equitable tolling, but it also "does not expressly prohibit equitable tolling." *Boechler*, 596 U.S. at 209. The provision uses mandatory language—"must be filed"—which the Court has recognized is relevant, though "not sufficient, on its own, to rebut the presumption of equitable tolling." *Enbridge*, 146 S.Ct. at 1082; *see, e.g.*, *United States v. Kwai Fun Wong*, 575 U.S. 402, 410–411, 420 (2015) (deadline stating that claim "shall be forever barred" was subject to equitable tolling).

The language in § 1252(b)(1) is similar to that of other statutory provisions for which the Court determined a statutory deadline may be equitably tolled. For instance, in *Irwin v. Department of Veterans Affairs*, the Court held that a statute requiring an individual file a lawsuit seeking review of an EEOC action "[w]ithin thirty days of receipt of notice of final action" was subject to equitable tolling. 498 U.S. at 94. Similarly, in *Boechler*, *P.C. v. Commissioner*, the Court determined that a "person may, within 30 days of a determination under this section, petition the Tax Court for review of such determination" 596 U.S. at 210 (quoting 26 U.S.C. § 6330(d)(1)).

In the rare cases where the Supreme Court has found the presumption rebutted, it is because Congress comprehensively listed exceptions to the claims-processing rule. The structure of the statute at issue in *Enbridge Energy, LP v. Nessel*, which included a list of

21

exceptions to the statute's mandatory rule, was the "decisive consideration" against reading equitable tolling into the statute. 146 S.Ct. at 1082. A "highly detailed scheme" including "equitable, case-specific exceptions" to the seemingly mandatory deadline makes "Congress's choice" to exclude equitable tolling "evident." *Arellano*, 598 U.S. at 14. But § 1252(b)(1) does not include a detailed statutory scheme containing a list of exceptions evincing Congress's intent to proscribe equitable tolling. As such, the plain text of § 1252(b)(1) does not rebut the presumption of equitable tolling.

Additionally, § 1252(b)(1) contains a "short, 30-day" filing deadline "directed at the [noncitizen], not the court," as in *Boechler*, 596 U.S. at 209. *See id.* (recognizing that the Court has previously found a 30-day deadline subject to equitable tolling); *Riley*, 606 U.S. at 261 (noting, in determining whether § 1252(b)(1) is jurisdictional, that § 1252(b)(1)'s 30-day rule "tells *aliens* what to do to obtain judicial review, but it provides no directives to *courts*") (emphasis in original). Finally, like the taxpayer system in *Boechler*, "the immigration system is one where 'laymen, unassisted by trained lawyers, often initiate the process,' which weighs in favor of equitable tolling." *Oxlaj-Perez*, 174 F.4th at 525 (citing *Boechler*, 596 U.S. at 209).

The Court has also instructed us to look to the "subject matter" of the statute to determine if the presumption is rebutted. *Holland*, 560 U.S. at 647. In *Holland v. Florida*, the Supreme Court recognized that "AEDPA's subject matter, habeas corpus, pertains to an area of the law where equity finds a comfortable home." *Id.* The same is true of 8 U.S.C. § 1252; after all, the Supreme Court has deemed the "basic purpose" of § 1252 to be the provision of "an adequate substitute for habeas review." *Guerrero-Lasprilla v. Barr*,

22

589 U.S. 221, 236 (2020).  The fact that § 1252(b)(1) concerns immigration removal orders bolsters the already strong equitable tolling presumption.[4]

The broader structure of the Immigration and Nationality Act ("INA") likewise supports the presumption of equitable tolling.  For example, after filing a petition for review, a noncitizen must file "a brief in connection with" their petition within 40 days of the Government's filing the administrative record.  8 U.S.C. § 1252(b)(3)(C).  However, that 40-day deadline can be extended "upon motion for good cause shown."  *Id.*  And the court need not dismiss a noncitizen's appeal if they file their petition late if "a manifest injustice would result."  *Id.*  This underscores Congress's view that the statute is "susceptible to equitable considerations."  *Oxlaj-Perez*, 174 F.4th at 525.  If Congress permitted this latitude with regards to the filing of a brief associated with the petition, it is unlikely that they would proscribe traditional equitable tolling with regards to the initial petition.  *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 163 (2013) (Sotomayor, J., concurring) (presuming tolling of "remedial statutes designed to protect the rights of unsophisticated claimants . . . may best honor congressional intent").

The Government nonetheless believes the presumption of equitable tolling does not apply to § 1252(b)(1).  We are not convinced.

---

[4] The Government argues that the public interest in the finality of immigration proceedings bodes against recognizing equitable tolling. While we find the relevant subject matter militates in favor of equitable tolling, subject matter can only "garnish an already solid argument." *Enbridge*, 146 S.Ct. at 1083–84. "[T]he nature of the subject matter cannot overcome text and structure" in determining if a statutory deadline may be equitably tolled. *Arellano*, 598 U.S. at 14. We, like the Sixth Circuit, do not find the general public interest in finality supports the Government's reading of the statute. *Oxlaj-Perez*, 174 F.4th at 528.

First, it argues that Federal Rule of Appellate Procedure 26(b)(2) proscribes extending the deadline for filing a petition for review of an agency order. Resp. Br. at 25 (citing Fed. R. App. P. 26(b)(2)). Rule 26(b)(2) specifies that courts "may not extend the time to file . . . a petition to enjoin, set aside, suspend, modify, enforce, or otherwise review an order of an administrative agency, board, commission, or officer of the United States, unless specifically authorized by law." The Government contends that Congress enacted § 1252(b)(1) against the backdrop of the Federal Rules of Appellate Procedure, so any reading of § 1252(b)(1) must not conflict with the Rules—and equitably tolling the 30-day deadline would effectively nullify Rule 26(b)(2)'s application to petitions for review. Thus, relying on the Supreme Court's decision in *Nutraceutical*, 586 U.S. at 192, it interprets "specifically authorized by law" to foreclose reading equitable tolling into this statute.

*Nutraceutical* concerned a class-action deadline set forth in Federal Rule of Civil Procedure 23(f). But, as the Sixth Circuit rightly noted, the question in *Nutraceutical* was whether the Federal Rules themselves—promulgated by the Supreme Court, rather than Congress—may be equitably tolled. *Oxlaj-Perez*, 174 F.4th at 527. The answer is no: unlike statutes, the Federal Rules carry no presumption in favor of equitable tolling, and the text of the Federal Rules do not contain the necessary "room for [] flexibility." *Nutraceutical*, 586 U.S. at 192. In contrast, "where 'the relevant filing deadline is provided by a statute and not a Federal Rule,' we look to that statute to determine tolling." *Oxlaj-Perez*, 174 F.4th at 527 (citing *Nelson v. SEC*, 138 F.4th 514, 523 (D.C. Cir. 2025)). Federal statutes are enacted against a presumption of equitable tolling that must be clearly rebutted by Congress.

24

Nor does the mere existence of Rule 26(b)(2) rebut the presumption in favor of equitable tolling. "The presumption in favor of equitable tolling of statutes of limitation drafted by Congress *is* law." *E.E.V.*, 180 F.4th at 978 (emphasis added). The D.C. Circuit rejected an identical argument, holding that "the presumption of equitable tolling applies to deadlines pertaining to petitions for review" despite Rule 26(b)(2)'s "specifically authorized" language. *Nelson*, 138 F.4th at 514. We agree with the Sixth, Seventh, and D.C. Circuits that Rule 26(b)(2) poses no barrier to recognizing that § 1252(b)(1) is subject to equitable tolling. *Oxlaj-Perez*, 174 F.4th at 527; *E.E.V.*, 180 F.4th at 978–79; *Nelson*, 138 F.4th at 523.

The Government also suggests that the legislative history of the INA cuts against the presumption of tolling both because Congress amended the language in § 1251(b)(1) to be mandatory, rather than permissive, and because it shortened the time allotted to seek judicial review. The shorter filing deadline, though it may have been enacted to "expedite both the initiation and the completion of the judicial review process," *Stone*, 514 U.S. at 399–400, does not persuade us to disregard the robust textual and contextual evidence in favor of equitable tolling. The previous version of § 1251(b)(1) used the phrasing "may be filed not later than" the prescribed deadline. 8 U.S.C. § 1105a(a)(1) (1994). We agree with the Sixth Circuit that such language is no more mandatory than the current use of "must be filed" in § 1251(b)(1). *See Oxlaj-Perez v. Blanche*, 174 F.4th at 529.[5] And the shortened deadline likewise does not persuade us to find the presumption of equitable

---

[5] Like the Sixth Circuit, we find the mandatory-permissive distinction less persuasive in the statute of limitations context, as whether the language is mandatory or permissive "tends to follow from whether the subject of the limitations provision is the person filing or the filing itself." *Oxlaj-Perez*, 174 F.4th at 523 n.1.

tolling rebutted.  After all, the Supreme Court has applied the tolling presumption to similar 30-day limitations periods.  *See Boechler*, 596 U.S. at 209; *Irwin*, 498 U.S. at 94.

The Government's administrability concerns are similarly unfounded.  For one, the mere fact that a statutory deadline may be equitably tolled does not mean every petitioner will successfully demonstrate that his case warrants equitable tolling.  Equitable tolling remains an "extraordinary remedy," and "litigants face a considerable burden to demonstrate that it applies."  *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 476 (4th Cir. 2015); *see also Oxlaj-Perez*, 174 F.4th at 530 (holding that even though § 1252(b)(1) may be equitably tolled, the petitioner did not meet his burden of demonstrating that his claim should be equitably tolled).  And, more importantly, "the new reality after *Riley* is that a petition for review will almost always come due long before withholding-only proceedings end."  *E.E.V.*, 180 F.4th at 976.  Equitably tolling § 1252(b)(1)'s 30-day deadline would lead to "no additional delay" for the many petitioners whose withholding and CAT claims remain pending after their final order of removal has issued.  *Id.*

We therefore hold that § 1252(b)(1)'s 30-day deadline is subject to equitable tolling.

B.

At last, we must determine whether Navarro's case merits equitable tolling.  Equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case."  *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) (citation modified).  Applying equitable tolling is proper when a litigant establishes "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in

26

his way and prevented timely filing." *Warfaa v. Ali*, 1 F.4th 289, 294 (4th Cir. 2021) (citing *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016)). "The flexibility inherent in equitable procedure enables courts to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." *Holland*, 560 U.S. at 631 (cleaned up). And "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Justus v. Clarke*, 78 F.4th 97, 105 (4th Cir. 2023) (citing *Holland*, 560 U.S. at 653) (cleaned up)).

We begin with the second prong: whether an extraordinary circumstance prevented Navarro from timely filing. Prior to *Riley*, we reviewed petitions for review filed thirty days after the Board's denial of withholding-only relief, even when the final order of removal had issued months earlier. *See, e.g.*, *Lizama v. Holder*, 629 F.3d 440, 442 (4th Cir. 2011). Navarro filed his petition before the Court clarified in *Riley* that petitioners must launch nominal challenges to removability even if they have no challenge to removability on the merits. 606 U.S. at 271–72. Because *Riley v. Bondi* altered the state of play while Navarro's petition was pending, rendering Navarro's petition untimely because it was filed thirty days after the Board's decision as to withholding and CAT, we hold that the extraordinary circumstances surrounding Navarro's petition prevented him from timely filing.[6]

---

[6] The Government disagrees, arguing that "the change in the law that a decision in withholding-only proceedings is not an order of removal happened on June 1, 2020, when *Nasrallah* was decided." Resp. Br. at 38. We find that hard to believe, since the Supreme Court stated the question in *Riley v. Bondi* as "whether an alien can obtain review of a Board of Immigration Appeals (BIA) decision in a "withholding-only" proceeding (*i.e.*, (Continued)

27

Next, we must determine whether Navarro satisfied the first prong and diligently pursued his rights. Based on the record before us, we hold that he did. Navarro pursued relief in the manner existing at the time he filed his petition. He did so with the understanding that the Board's final decision on the merits of his withholding and CAT claims constituted the "final order of removal" in his case. Unlike the petitioner in *Oxlaj-Perez*, 174 F.4th at 520, who petitioned for review of the Board's decision on withholding two months after its issuance, Navarro petitioned for review within thirty days of the Board's decision denying withholding relief, as the Board's own notice instructed. J.A. 2. Thus, we hold that Navarro is entitled to equitable tolling.

The Government points to cases where we have recognized that a change of law is not an "extraordinary circumstance" justifying equitable tolling. But those cases bear on a separate question: whether a petitioner can bring an otherwise untimely challenge because new law rendered an extant claim meritorious. We answered no, because we recognized that the "futility" of a claim "is not a valid justification for filing an untimely petition." *Whiteside v. United States*, 775 F.3d 180, 185 (4th Cir. 2014) (cleaned up). In contrast, the applicable change of law in Navarro's case governed *when* he should petition for our review at all, not whether his petition had merit.

With that, we turn to the merits of Navarro's case.

---

one in which removal from the United States is not at issue) by filing a petition for review within 30 days of that decision." 606 U.S. at 263. *See* Sup. Ct. R. 10 ("A petition for a writ of certiorari is rarely granted when the asserted error consists of . . . the misapplication of a properly stated rule of law.").

V.

We review both the Board's ruling and the IJ's opinion in a case like this, where the Board has "adopted and supplemented" the IJ's reasoning. *Barahona v. Holder*, 691 F.3d 349, 353 (4th Cir. 2012). We review the Board's legal determinations de novo, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015), and its factual determinations for substantial evidence. *Ayala-Osegueda v. Garland*, 92 F.4th 220, 235 (4th Cir. 2024). The agency's factual finding is "conclusive," 8 U.S.C. § 1252(b)(4)(B), unless "the evidence not only supports [a contrary] conclusion, but compels it." *Id.* (citations omitted).

We may also overturn the Board's determinations if the Board abused its discretion. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019). The Board "may be held to have abused its discretion if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). A "wholesale failure to consider relevant and legally significant evidence" is also an abuse of discretion. *Alvarez Lagos v. Barr*, 927 F.3d 236, 256 (4th Cir. 2019) (citation modified).

Navarro raises several challenges to the Board's adjudication of his legal claims. We will address each in turn.

A.

First, we consider Navarro's claim that the IJ and Board erred in determining that Navarro had not established that his actual or imputed anti-gang political opinion was a central reason for the harm he faced in El Salvador and will face upon his return. J.A. 5. Navarro first claims that the IJ and Board disregarded substantial evidence in the record

29

when they determined that Navarro's anti-gang work with children did not constitute anti-gang political opinion and would not be viewed as such. Navarro then contends that the IJ and Board erroneously determined no nexus exists between Navarro's actual or imputed political opinion and MS-13's persecution of Navarro.

An applicant for withholding of removal must establish a "clear probability" that, if removed, "his life or freedom would be threatened on account of a statutorily protected status, a list that includes 'membership in a particular social group' as well as race, religion, nationality, and political opinion." *Garcia v. Garland*, 73 F.4th 219, 229 (4th Cir. 2023) (citing 8 U.S.C. § 1231(b)(3)(A)). The applicant bears the burden of showing that his status is "at least one central reason" for the risk of harm he faces. *Id.* at 229.[7]

When a petitioner claims he "has been or will be persecuted on account of an imputed political belief, then the relevant inquiry is not the political views sincerely held or expressed by the victim, but rather the persecutor's subjective perception of the victim's views." *Alvarez Lagos*, 927 F.3d at 254. A petitioner must show that his "persecutors actually imputed a political opinion" to him. *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 450–51 (4th Cir. 2007). The Ninth Circuit has recognized that "political opinions encompass more than electoral politics or formal political ideology or action." *Rodriguez Tornes v. Garland*, 993 F.3d 743, 752 (9th Cir. 2021).

---

[7] Navarro focused on whether his political opinion was imputed below and on appeal. Thus, we focus on whether his persecutors imputed an anti-gang political opinion on him.

30

At every step, the IJ and the Board disregarded relevant evidence that MS-13 perceived Navarro's anti-gang involvement as evidence of his political opinion and targeted him on that basis. We hold that this was an abuse of discretion and contrary to substantial evidence in the record.

First, the IJ and the Board failed to address Dr. Sarah Bishop's expert testimony and Navarro's testimony that his actions would constitute an actual or imputed political opinion. *See Alvarez Lagos*, 926 F.3d at 236 (finding reversible error where agency ignored similar evidence in its nexus analysis). Both the IJ and the Board instead simply assumed that MS-13 would not perceive Navarro's actions to constitute an anti-gang political opinion. In *Alvarez Lagos*, we recognized that the Board committed reversible error when it ignored expert testimony that the petitioner's actions would be seen as "a direct challenge to [the gang's] efforts to establish and maintain political domination within Honduras." 927 F.3d at 236. Navarro put forth similar evidence. For one, Navarro testified extensively about his work to direct children away from gangs. Navarro described his work with children as a method to "promote alternatives to gang recruitment for work." J.A. 852. He noted that while he initially "tried to keep the anti-gang messaging of the committee on the down low," his work was quickly discovered by MS-13, who derisively called him "the new shepherd." J.A. 853. Navarro credibly testified that he believed the label was connected to his work guiding children toward better paths. J.A. 555.

The political nature of Navarro's anti-gang activity is only augmented by the quasi-governmental nature of MS-13 in El Salvador. J.A. 6. Navarro provided substantial expert testimony to support this element of his claim. For example, Navarro's expert, Dr. Bishop,

31

testified that gangs in El Salvador "operate as a kind of de facto government." J.A. 628. She noted that Navarro's efforts to provide youth alternatives to gang recruitment "would likely be stopped" because gangs "rely on the visibility of their authority and control and so efforts to undermine or undercut that authority through this kind of grassroots work to community members from joining gangs would not be looked upon favorably." J.A. 629. This evidence, which the IJ and Board ignored, demonstrates that Navarro's work would be considered by MS-13 to be anti-gang opposition. *Cf. Alvarez Lagos*, 927 F.3d at 251 (quoting expert testimony that Barrio 18 "sees [Alvarez Lagos's] failure to pay as a political act, not simply a refusal to pay a debt," so she "reasonably fears persecution on account of her perceived political opposition to Barrio 18"). The IJ and Board's wholesale failure to engage with this evidence in addressing Navarro's claim constituted an abuse of discretion.

Next, the IJ and the Board's nexus determination assumed that Vallecillos's role in threatening Navarro rendered other causes for persecution irrelevant. *See* J.A. 146 ("MS-13 also did not threaten or harm the Applicant for his work on the committee building a soccer field. Rather, the Applicant got into a personal dispute with Mr. Vallecillos, over land."); J.A. 6 ("The Immigration Judge further found that the central reason the MS-13 targeted the applicant was because he had a personal dispute with a rich man, Mr. Vallecillos."). This was "manifestly contrary to law and an abuse of discretion." *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 208 (4th Cir. 2019) (internal quotation marks omitted). We have repeatedly recognized that "multiple reasons for persecution can be intertwined," *Lopez Ordonez v. Barr*, 956 F.3d 238, 245 (4th Cir. 2020), because "more than one central

32

reason may, and often does, motivate a persecutor's actions." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017). We merely ask that the petitioner "point[] to some evidence that her protected trait factored into the gang's decisionmaking and explain[] why the gang targeted the petitioner and not someone else." *Flores-Turcios v. Blanche*, No. 24-1338, 2026 WL 2051836, at *3 (4th Cir. July 16, 2026).

Unrebutted evidence in the record indicates that MS-13's retaliation for Navarro's altercation with Vallecillos was "intertwined" with its reprisals for his anti-gang activity. Navarro's interactions with Vallecillos stemmed from his anti-gang work; when he approached Vallecillos, he did so in his capacity as a Vice President of the youth committee. That role had already earned him violent attention from MS-13. *See* J.A. 555 (Navarro testifying that MS-13 members called him "shepherd" before shoving him in the creek, spitting on him, and remarking that "the gang controls here . . . we're the bosses here"). Vallecillos's anger at Navarro only bolstered the gang's pursuit of Navarro. The gang's interactions with Navarro, particularly when read against the backdrop of Navarro's expert's testimony, indicate that MS-13 viewed Navarro as challenging its authority. It was legal error to assume that an additional, related reason to target Navarro somehow canceled out the gang's continuous frustration with Navarro's anti-gang activities.

Lastly, and perhaps most egregiously, the IJ determined that the rumor that Navarro killed Calavera, the local gang leader, did not contribute to an imputed anti-gang opinion. The IJ found Navarro credible and found that he had put forth corroborating evidence to show that the rumor really did circulate in the community. *See* J.A. 142. Navarro also put forth evidence that, when he relocated following Calavera's death, the MS-13 clique from

33

his hometown arrived at his workplace and interrogated his coworkers regarding his whereabouts.

Despite this evidence, the IJ denied relief because Navarro's family remained unharmed. *See* J.A. 146 ("[T]he gang likely no longer believes the Applicant killed Calavera, and therefore does not impute an anti-gang political opinion on him."); J.A. 6 (Board affirming IJ's determination). The IJ speculated that if the gang truly believed the rumor, it would have killed Navarro's family by now. Since the family is still alive, then the rumor was unheeded, and therefore the gang did not impute an adverse political opinion to Navarro.

The survival of an applicant's family is not an appropriate standard for determining whether the applicant was persecuted due to an imputed political opinion. The IJ appeared to recognize that MS-13 would view the murder of one of its leaders as a challenge to its authority and would therefore impute an anti-gang political opinion on Navarro if sufficient evidence supported his claim. And it found that Navarro had credibly relayed this rumor. Its conclusion that Navarro would likely remain unharmed, then, was contrary to substantial evidence in the record. If the threshold to relief required the murder of an applicant's family, few applicants could ever make their cases. This is the rare case where the record "not only supports [a contrary] conclusion, but compels it." *Ayala-Osegueda*, 92 F.4th at 235.

We therefore vacate the Board's determination as to Navarro's imputed political opinion claim and remand for further proceedings.

### B.

Next, we address Navarro's challenge to the Board's ruling denying withholding of removal on account of his proposed PSG.

Navarro argues that the Board and the IJ abused their discretion and erred as a matter of law in determining that "Individuals in El Salvador Who Witness and Report Crimes by MS-13 to the Police" is not a cognizable PSG.  The Board, affirming the IJ's decision, determined that the PSG Navarro identified was (1) not sufficiently particular and (2) not viewed by society as socially distinct.  J.A. 4–5.

To establish membership in a PSG, a petitioner must demonstrate that the group meets three elements.  First, members of the group must "share common, immutable characteristics." *Lizama*, 629 F.3d at 447. Second, members of the group must have "social visibility" or "social distinction."  *Id.*  Third, the group must be "defined with sufficient particularity to delimit its membership." *Id.*  "[A]lthough the cognizability of a proposed PSG presents a question of law, this question is analyzed through a 'fact-based inquiry made on a case-by-case basis.'"  *Guardado v. Bondi*, 147 F.4th 432, 438 (4th Cir. 2025) (citing *Espinoza-Ochoa v. Garland*, 89 F.4th 222, 231–32 (1st Cir. 2023)).

The Board only reached the second and third prongs:  whether Navarro's proposed PSG was socially distinct and whether it was sufficiently particular.  Its social distinction determination applied the incorrect legal standard and ignored evidence in the record, constituting an abuse of discretion.  And its determination that Navarro's proposed PSG lacked particularity was legally erroneous.  We therefore reverse in part and vacate in part the Board's ruling.

### i. Social Distinction

We begin with the Board's social distinction determination.  Whether society views a proposed PSG as socially distinct is a question of fact we review for substantial evidence.

35

*Nolasco v. Garland*, 7 F.4th 180, 189 (4th Cir. 2021). But "[w]hether the agency employed the correct standard for social distinction is a question of law we review de novo." *Id.* (citations omitted).

The social distinction requirement asks whether the "home society actually does recognize that group as being a 'distinct' and identifiable group." *Amaya*, 986 F.3d at 433. "The relevant question is whether Salvadorean society views [the] proposed group as 'set apart . . . in some significant way.'" *Morales*, 51 F.4th at 557 (citing *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238).

The Board held that Navarro failed to prove that his proposed PSG was socially distinct because Navarro did not show that the proposed PSG is "public in nature" and did not provide evidence that society would "recognize his group." J.A. 5. Navarro argues that requiring the PSG be "public" was legal error because social distinction does not require ocular visibility. And Navarro also contends that he submitted evidence that society in El Salvador would recognize his group, and the Board's failure to engage with this evidence was an abuse of discretion. We agree on both counts.

We have previously stated that "[p]erception" in the social distinction context "does not require ocular visibility: society can consider persons to comprise a group without being able to identify the group's members on sight." *Nolasco*, 7 F.4th at 187 (citations omitted). In other words, a PSG can be socially distinct even if membership is not obvious to the public. Thus, it was legal error for the IJ and the Board to consider whether the public nature of "Individuals in El Salvador Who Witness and Report Crimes by MS-13 to the Police" bore on the distinctiveness of the group.

36

Second, the Board and the IJ's finding that El Salvadorean society does not view Navarro's proffered PSG as distinct ignored legally relevant evidence in the record. The Board stated that Navarro "did not provide evidence to demonstrate that the society in question would recognize his group" and "does not cite to *any* testimony or country conditions in evidence that show that society as a whole in El Salvador, rather than solely the persecutors or their collaborators, perceives or recognize [Navarro's proposed PSG] as a distinct group." J.A. 5 (emphasis added).

To the contrary, Navarro submitted ample evidence that El Salvador recognizes his proposed PSG. For example, Navarro's expert submitted a declaration stating that "El Salvador's Special law for the Protection of Victims and Witnesses (Decreto No. 1029) explicitly recognizes the need for victims, witnesses, and other persons involved in the investigation of crime . . . to be protected." J.A. 935, Expert Declaration of Dr. Elizabeth Kennedy.

The Ninth Circuit has recognized that this very law may render the PSG "people testifying against or otherwise [opposing] gang members" socially distinct. *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013). In the Ninth Circuit's words, "[i]t is difficult to imagine better evidence that a society recognizes a particular class of individuals as uniquely vulnerable, because of their group perception by gang members, than that a special witness protection law has been tailored to its characteristics." *Id.*

Navarro's expert also recognized the code of silence present in El Salvador of "ver, oir y callar," or "see, hear and shut up." J.A. 913. "[S]trict compliance is also required from people living in the territory a gang controls . . . the absolute requirements are to be loyal, to ver, oir y callar, or 'see, hear, and shut up' and to comply with demands." J.A.

37

1081. Salvadoreans grow up aware of "the risks to their life and the lives of those they love, if they decide to report crimes to authorities." J.A. 913. Thus, Decreto No. 1029's enactment reflects an understanding that individuals who "break the code" face "death threats or even murder." J.A. 1085.[8]

Like the Ninth Circuit, we find El Salvador's enactment of a law specifically protecting witnesses of crimes, along with Navarro's expert's declaration, to be persuasive evidence that El Salvadoreans perceive Navarro's proposed PSG to be socially distinct. The IJ and Board ignored evidence in reaching their conclusion that Navarro submitted no evidence bearing on his proposed PSG's social distinctiveness.

Thus, the Board's conclusion that Navarro's proposed PSG lacked social distinction was an abuse of discretion and contrary to substantial evidence in the record.

## ii. Particularity

We now turn to the particularity requirement. Whether a PSG meets the legal standard for particularity is a question of law we review de novo. *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021). Such a group must have "concrete, identifiable boundaries" that allow the group's members to be distinguished from non-members. *Temu v. Holder*,

---

[8] The Government contends that Navarro forfeited any argument that his PSG is socially distinct because he did not argue that the determination is unsupported by substantial evidence. But the Government misunderstands Navarro's claim: Navarro contends that the Board's legal error—its failure to engage with "legally significant evidence" when adjudicating Navarro's claim—constituted an abuse of discretion. *Marquez v. Bondi*, 160 F.4th 418, 430 (4th Cir. 2025). So, while the Board is "not required to discuss every piece of evidence in the record," it *is* required to consider the legally relevant evidence Navarro put forth to support his claims. *Molina-Diaz v. Bondi*, 128 F.4th 568, 577 (4th Cir. 2025). Its failure to do so is an abuse of discretion and requires vacatur.

740 F.3d 887, 892 (4th Cir. 2014). Importantly, "particularity chiefly addresses the *outer limits* of a group's boundaries and is definitional in nature." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 241 (B.I.A. 2014) (emphasis added) (internal quotation marks omitted). A group must have boundaries "fixed enough to qualify as a particular social group." *See Temu*, 740 F.3d at 895. A PSG lacks particularity when it "changes dramatically based on who defines it." *Id.*; *see id.* (recognizing that "affluent Guatemalans" fails as a PSG because 'affluent' could refer to the "wealthiest 1%" or the "wealthiest 20%").

Navarro's proposed PSG encompasses "Individuals in El Salvador Who Witness and Report Crimes by MS-13 to the Police." On appeal, Navarro argues that the Board and IJ did not apply the correct method for resolving ambiguity in the terms "report" and "crimes"; the Board disregarded any distinction Navarro made between the word "witness" as a verb and a noun; and the PSG should have been evaluated in its entirety, rather than in individual components.

We agree. Conducting a "piecemeal" analysis, both the Board and the IJ determined that Navarro's particular social group was not sufficiently particular. *Id.* at 896. The IJ held that Navarro's particular social group lacked the requisite "particularity and social distinction." J.A. 496–97. The Board affirmed this determination on appeal, holding that the term "witness" is overbroad. The Board relied on *Herrera-Martinez v. Garland*, 22 F.4th 173, 182–85 (4th Cir. 2022), in which we held that the PSG "prosecution witnesses" was not sufficiently particular. There, we reasoned that, in its noun form, a "witness" may "merely have knowledge about an event" or "testify under oath." *Id.* at 183. And we recognized that the term "prosecution" did little to clarify the scope of "witnesses."

39

The Board also cited to *Morales v. Garland*, 51 F.4th 553, 556–57 (4th Cir. 2022), in which we determined that the PSG "Salvadorean women who are witnesses to gang criminal activity and targeted because they filed a police report" lacked particularity. In *Morales*, we relied on *Herrera-Martinez* and likewise noted the indeterminate sweep of "witnesses," which we held can refer to "bystanders, informants, or those who testify in court." *Morales*, 51 F.4th at 557. Applying both cases, the Board held that the use of "witness" in Navarro's proposed PSG contributed to its "amorphous" nature.

As for the term "report," the Board stated that the term can refer to someone who speaks with police, but it can also refer to an individual who "filed an official complaint with the police." J.A. 4. On that basis alone, the Board found "report" too amorphous. The Board likewise stated that the term "crimes" is too broad, since it "spans a wide range of criminal activity." J.A. 4. It again relied on *Morales*, where we held that "[c]riminal activity could span offenses ranging in severity from petty theft to first-degree murder." *Morales*, 51 F.4th at 557.

The Board concluded that these terms "have no fixed meaning and their application could vary widely depending on context." J.A. 4. The terms did "not provide an adequate benchmark for determining group membership." J.A. 4. So the Board held that Navarro's proposed PSG is "impermissibly amorphous and subjective. J.A. 4.

Taken together, however, terms that may appear amorphous in isolation can nonetheless establish particularity. We require that PSGs be analyzed in their entirety, rather than in a "piecemeal" manner. *Temu*, 740 F.3d at 896. "Nothing in the statute [governing withholding of removal] requires that if a group is defined by a collection of

40

traits, that each individual trait must meet all the criteria for a "'particular social group.'" *Id.* We must assess "not whether the group can be subdivided based on some arbitrary characteristic but whether the group itself has clear boundaries." *Amaya*, 986 F.3d at 434. By focusing entirely on individual terms in Navarro's proposed PSG, the Board missed the forest for the trees.

Navarro's proposed PSG bears more similarity to the PSG in *Amaya v. Rosen*: "former Salvadoran MS-13 members." 986 F.3d at 434. We recognized that the PSG in *Amaya* contained "several self-limiting features" clearly defining the group's boundaries. The PSG referenced "a single notorious gang," which "le[ft] no ambiguity as to how a 'gang' might be defined." *Id.* It encompassed people in El Salvador, "eliminating many people . . . from other countries." *Id.* And "it exclude[d] all current members of MS-13, all non-Salvadorans, and anyone who has never been a member of MS-13." *Id.* at 429. Because the group "provide[d] a clear benchmark for who is in the group," we held that it satisfied the particularity requirement. *Id.*

In *Amaya*, the Government countered that it would be too "difficult to ascertain who exactly is a former gang member." *Id.* at 429. But "[a] difficult application does not turn a clear rule into a vague standard." *Id.* at 435. To be sure, "[w]hether an applicant is a member of the group is a factual question for the fact-finder to determine on a case-by-case basis." *Id.* at 435. And that decision "may sometimes be difficult based on the available evidence." *Id.* at 436. The mere difficulty of ascertaining an individual's membership in a proposed PSG does not, however, indicate that the PSG itself lacks particularity. *See id.*

Read in its entirety, Navarro's proposed PSG, "Individuals in El Salvador Who Witness and Report Crimes by MS-13 to the Police," is sufficiently particular. We read words in PSG as they would "common[ly]" be "underst[ood]," relying on dictionaries to facilitate that process. *Herrera-Martinez*, 22 F.4th at 183. The crimes must be committed by MS-13, "a single notorious gang." *Amaya*, 986 F.3d at 434. "[I]ndividuals *in* El Salvador" must bear witness to the crimes, excluding those in other countries. *Id.* Unlike the noun form of 'witness,' which can encompass a broad range of involvement, *Morales*, 51 F.4th at 557, the verb 'witness' in essence means, to see something—particularly when read with the term 'report.' *See Witness*, Merriam Webster, https://www.merriam-webster.com/dictionary/witness, https://perma.cc/9RLX-GVQH (last visited July 27, 2026) (defining 'witness' as "to see for oneself"). The surrounding verbiage therefore narrows the meaning of "witness" in Navarro's proposed PSG.

The Board also assumed that "report" was impermissibly subjective because it could encompass "someone who speaks with the police at the scene of a crime or someone who files an official complaint with the police about a crime." J.A. 4. The mere "existence of smaller parts within the whole" does not "automatically discount the existence of a particular social group." *Escobar Gomez v. Garland*, No. 20-1654, 2021 WL 5860746, at *3 (4th Cir. Dec. 10, 2021); *see Amaya*, 986 F.3d at 435. The verb form of "witness" sufficiently narrows the scope of "report," signifying that any report to the police results from the crime witnessed. Notably, in *Morales*, we took no issue with the proposed PSG's use of "report." 52 F.4th at 557.

42

Finally, while the term 'by' in isolation could permit wide-ranging MS-13 involvement, *Herrera-Martinez*, 22 F.4th at 183, 'by' in "Individuals Who Witness and Report Crimes By MS-13" is modified by 'witness' and 'report.' Thus, it would be read to mean "through the agency or instrumentality of" MS-13. *By*, https://www.merriam-webster.com/dictionary/by, https://perma.cc/4J7S-339P (last visited July 27, 2026). In other words, MS-13 must instigate the crimes witnessed. We are not persuaded by the Government's argument that the proposed PSG sweeps in crimes to which MS-13 maintains only a bare-bones connection.

Contrary to the PSGs proposed in both *Herrera-Martinez* and *Morales*, on which the Government relies, Navarro's proposed PSG limits the gang, the location, and the extent of the individual's relationship to the gang's activity, therefore creating "objective goalposts delineating the boundaries to the group." *Id.* at 435.

True, Navarro's proposed PSG includes the term 'crimes,' and we doubted the particularity of "criminal activity" in "Salvadoran women who are witnesses to gang criminal activity and targeted because they filed a police report." *Morales*, 52 F.4th at 557. But, contrary to the Board's determination, we did not reject that PSG because the term 'criminal activity' "carries multiple meanings." J.A. 4. Instead, the breadth of the term 'criminal activity' only augmented the amorphous nature of terms like 'targeted,' which we recognized "could refer to exposure to physical harm, verbal threats, or some other kind of lesser attention." *Morales*, 52 F.4th at 557. Even read in context, the capacious nature of 'targeted' renders the PSG in *Morales* indeterminate. *See also Zelaya v. Holder*, 668 F.3d 159, 166–67 (4th Cir. 2012) (rejecting proposed PSG because the phrases "opposition

43

to gangs" and "[r]esisting gang recruitment" were too "amorphous"); *Lizama*, 629 F.3d at 447 (rejecting proposed PSG because "wealth," "Americanization," and "criminal history" were too amorphous).

In contrast, the "common understanding" of terms in Navarro's proposed PSG are limited in scope, *Herrera-Martinez*, 22 F.4th at 183, so the "collection of traits" at issue here sharpens the outer limit of Navarro's proposed PSG. *Temu*, 740 F.3d at 896. Again, we merely require that outer bounds of the group not "change[ ] dramatically based on who defines it." *Id.* at 895. Navarro's proposed PSG excludes individuals who have not witnessed *and* reported a crime by MS-13, individuals who witnessed a crime by MS-13 somewhere other than El Salvador, and individuals who report crimes by MS-13 to organizations other than the police. These "self-limiting features" are "baked into the definition" of Navarro's proposed PSG, rendering it sufficiently particular. *Amaya*, 986 F.3d at 434.

We note that "whether [the applicant] met his burden that he was actually in the" PSG is a distinct inquiry from whether a proposed PSG is particular. *Id.* at 435. As the IJ noted, the record does not indicate that Navarro reported the crime he witnessed to the police; his aunt did. Consequently, the Board and the IJ must assess whether Navarro is an actual or imputed member of his proposed PSG. But, again, that question is separate from whether his proposed PSG lacks particularity.

*          *          *

Thus, we reverse in part and vacate in part the Board's July 28, 2023 decision as to Navarro's withholding claim. The Board committed legal error and ignored substantial evidence in the record in determining that Navarro's proposed PSG lacked social

44

distinction. It also legally erred in holding that Navarro's proposed PSG was not sufficiently particular. We remand to the Board to determine the cognizability of Navarro's proposed PSG.

C.

Finally, we address Navarro's challenge to the Board's denial of his claim for protection pursuant to CAT. Navarro claims that the Board and the IJ committed several errors. He contends that they mischaracterized Navarro's claim, because Navarro fears torture and further persecution by MS-13, not Vallecillos. And he argues that the Board and the IJ failed to meaningfully engage with the record evidence Navarro put forth in support of his claim. We agree, so we vacate the Board's denial of CAT relief and remand for further proceedings.

To receive CAT protection, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture" is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" that is "by, or at the instigation of, or with the consent or acquiescence of," a public official or other person acting in an official capacity. *Id.* § 1208.18(a)(1).

We look at multiple factors when determining whether an applicant is entitled to CAT protection, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to part of the country of removal where he or she is not likely to be tortured; and evidence of gross, flagrant, or mass violations of human rights within the country of removal. *Id*. §§ 1208.16(c)(3)(i)-(iii). "Relevant, but not dispositive"

45

to this inquiry is "whether petitioner is able to 'relocate to a part of the country of removal where' the petitioner 'is not likely to be tortured.'" *Funez-Ortiz v. McHenry*, 127 F.4th 498, 503 (4th Cir. 2025) (citing 8 C.F.R. § 1208.16(c)(3)(ii)).

"A public official acquiesces to torture if, prior to the activity constituting torture, the official has awareness of such activity and thereafter breaches his or her legal responsibility to intervene to prevent such activity." *Lizama*, 629 F.3d at 449 (cleaned up) (quoting 8 C.F.R. § 1208.18(a)(7)). Officials "need not have actual knowledge of the torture; it is enough if they simply turn a blind eye to it." *Cabrera Vasquez v. Barr*, 919 F.3d 218, 222 (4th Cir. 2019) (cleaned up).

We have recognized that IJs need not quantify the risk posed by each source in their analysis; it is enough that they state that they aggregated the potential risks and concluded a noncitizen is not entitled to CAT relief. *See Ibarra Chevez v. Garland*, 31 F.4th 279, 290 (4th Cir. 2022). But, though the IJ in Navarro's case stated that it considered the risks of harm Navarro faces in the aggregate, its analysis appears to consider in isolation the varying risks Navarro faces from MS-13. *See* J.A. 167–68. And it also considered Vallecillos and MS-13 to constitute two completely distinct threats. While both Vallecillos and the death of Calaveras constitute distinct *reasons* for MS-13 to target Navarro, MS-13 is the common threat. We approach our analysis with that in mind.

The Board and the IJ's conclusion that Vallecillos and MS-13 posed no particularized risk of harm "disregarded and failed to meaningfully engage with record evidence." *Marquez*, 160 F.4th at 433. The IJ discussed Navarro's fear of Vallecillos and Vallecillos's role in employing MS-13 to "carry out his personal vendettas," but

46

nonetheless concluded that the risk of Vallecillos continuing to harm Navarro if he returns to El Salvador to be "low." J.A. 167. Similarly, the IJ considered Navarro's fear of MS-13 and acknowledged the "wealth of evidence" demonstrating MS-13's prominence in El Salvador. J.A. 167. Despite this evidence, the IJ also concluded that the evidence suggesting that MS-13 has continued to search for Navarro since he arrived in the United States is "insufficient." J.A. 167.

The record, however, tells a different story. Navarro credibly testified as to his past torture by MS-13, the threats he received from MS-13 while in El Salvador, and that Vallecillos approached Navarro's brother and told him that he was expecting Navarro's return to El Salvador. J.A. 615. That could be enough; "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." *See Alvarez Lagos*, 927 F.3d at 256 (citing 8 C.F.R. § 1208.16(c)(2)). But Navarro also provided multiple affidavits and expert testimony corroborating his testimony.

For example, his brother, Narciso, stated that Navarro received threatening calls to his grandmother's house after his altercation with Vallecillos. J.A. 864. Narciso stated that, after Calavera's death, MS-13 gang members watched their grandmother's house, waiting for Navarro. When Navarro went to work elsewhere, he was quickly located; after multiple relocations, he fled to the United States. J.A. 864. In Narciso's words, it is "understood throughout the community that Vallecillos is waiting for [Navarro's] return"—Vallecillos "has an 'account to settle' with [Navarro]." J.A. 864.

Navarro's brother Kevin likewise stated that Vallecillos is "seeking revenge" and awaiting Navarro's return. J.A. 869. Navarro's cousin, Maritza Madrid, said the same:

47

that Vallecillos seeks revenge against Navarro and "will make good on his threats" toward Navarro if he returns. J.A. 874. She also noted that she was threatened by Vallecillos after Navarro's departure—she and the other members of the committee "dissolved the committee" to avoid Navarro's "terrible situation." J.A. 874. These affidavits were "unrebutted." *Rodriguez-Arias*, 915 F.3d at 974. The IJ and the Board did not find the affidavits to be biased, or otherwise incredible, "call[ing] into question" the agency's reason for ignoring them. *Ali Hua Chen v. Holder*, 742 F.3d at 171, 179 (4th Cir. 2014).

The IJ and the Board's conclusion that Navarro "could relocate[]" to another part of El Salvador where he could not be tortured similarly disregards the record evidence that Navarro relocated multiple times before returning to the United States. After Calavera, acting on behalf of Vallecillos, threatened Navarro, Navarro left San Nicolas and moved to Chalatenango. J.A. 620. A week after MS-13 interrogated his colleagues in Chalatenango, Navarro moved to Jucuapa. But MS-13 located him there as well and asked him for identification; he was worried that, if MS-13 identified him, they would notify the clique in San Nicolas. So, Navarro moved again, to Jocurro, where MS-13 likewise had a strong presence. J.A. 571. The family he hoped to stay with in Jocurro told him he could not reside with them, as MS-13 had penalized them for failing to ask for permission to stay there. At that point, fearing torture or death by MS-13, Navarro left for the United States.

Navarro's coworker, Nanci Torres, submitted a report corroborating the threats Navarro had mentioned receiving from MS-13 in Chalatenango. When Navarro did not arrive to work one day, Torres was interrogated by MS-13 members regarding Navarro's patterns, including what time he arrives to work and what path he takes home. J.A. 878.

48

After the conversation, Torres told Navarro not to come back to work because she "wanted to keep him safe and prevent a tragedy." J.A. 879.

Each time Navarro attempted to escape MS-13, he was found. His fear that MS-13 would share information about his whereabouts within the gang is well-founded, based on his prior experiences of torture by MS-13 and the threats he received from them. Notably, the Board stated that Navarro "did not stay [in Jucuapa] long enough to know whether MS-13 members would have harmed or threatened him." J.A. 8. That is absurd. Perhaps in some cases, where an applicant has not faced a decade of violence and threats before and after leaving for the United States, we would require more than an unrealized fear of gang violence. But the record, rife with Navarro's repeated and unsuccessful attempts to escape MS-13's reach, demonstrate that he was unable to relocate within El Salvador to avoid torture.

The IJ also found that any claim that "MS-13 will torture or kill" Navarro upon his return was "speculative" because Navarro's siblings remained alive and did not attest that they have been harassed by MS-13. J.A. 167. As we explained when discussing Navarro's withholding claim, the violent deaths of family members is not a prerequisite to relief. Vallecillos repeatedly threatened Navarro's brother and told Navarro's family members that he sought to harm Navarro. If Navarro's siblings were harmed, it would bolster the particularized risk of harm Navarro faces if he returns to El Salvador. But MS-13's failure to torture Navarro's siblings and colleagues does not defeat Navarro's claim.

Finally, in addressing the "acquiescence" prong, the IJ found that even if Navarro established that it is more likely than not that he will tortured or killed upon his return to El Salvador, "the Salvadoran government has not been complicit in such conduct and has

49

made significant efforts to combat gang violence." J.A. 168. The IJ acknowledged that Navarro's aunt reported to a policeman who then notified MS-13. J.A. 149. But the IJ determined this was an action by a "rogue officer[]" and did not constitute "government acquiesce (sic)." J.A. 149. In a vacuum, perhaps that is true. However, the IJ's conclusion once again "selectively consider[ed]" evidence Navarro marshalled regarding coordination between MS-13 and the El Salvadorean government. *Marquez*, 160 F.4th at 433 (citing *Ai Hua Chen*, 742 F.3d at 179).

For one, the IJ relied primarily on the 2021 Human Rights Report for El Salvador issued by the U.S. Department of State in making its determination. And it noted that President Bukele's administration has "taken significant enforcement action against the gangs." J.A. 150. The IJ referenced Navarro's evidence in a sentence, stating that MS-13 maintains a "large presence" in El Salvador and that "gang violence and corruption remain problematic." J.A. 167. But the Board and the IJ did not "meaningfully engage with" the evidence Navarro submitted demonstrating MS-13's collusion with the El Salvadorean government. *Alvarez Lagos*, 927 F.3d at 255. Navarro testified that he did not include affidavits from other committee members or political actors because of the widespread corruption in El Salvador, which he went on to describe. J.A. 601–02. Navarro's expert, Dr. Bishop, testified that MS-13 acts as a "de facto government" in El Salvador, and that the government's claims regarding the falling homicide and disappearance rate were inaccurate, given underreporting by the El Salvadorean government. J.A. 628. And Navarro submitted substantial country conditions reports concerning the quasi-governmental nature of MS-13 in El Salvador.

50

We hold that the Board abused its discretion in ruling that Navarro did not meet his burden to establish his entitlement to CAT relief. The IJ found Navarro's testimony to be credible and recognized that Navarro had experienced past torture. It also recognized that Navarro's testimony was corroborated by affidavits, none of which the IJ found biased or otherwise unreliable. Considering the torture, the efforts to seek out Navarro, and Navarro's several failed attempts to flee his persecutors, the Board's conclusion that Navarro did not demonstrate a particularized risk of harm "ignore[es] that evidence that corroborates [Petitioner's] claims and calls into question the conclusion the judge [was] attempting to reach." *Marquez*, 160 F.4th at 433 (citing *Ai Hua Chen*, 742 F.3d at 179).

We therefore vacate the Board's ruling denying Navarro CAT relief.

## VI.

For the above reasons, we deny the Government's motion to dismiss, or, in the alternative, motion for summary disposition, grant Navarro's petition for review, vacate the denial of Navarro's withholding of removal and CAT claims, reverse the agency's PSG determination, and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED, REVERSED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS*

51

WILKINSON, Circuit Judge, dissenting:

In April 2016, Jaime Daniel Navarro Cerritos was ordered removed from the United States. Two thousand six hundred and ninety-one days later—and eight hundred seventy-eight days after his removal order was reinstated—he petitioned this court for review.

He is far too late. Under 8 U.S.C. § 1252(b)(1), a "petition for review must be filed not later than 30 days after the date of the final order of removal." Congress enacted this deadline to accelerate judicial review in immigration cases and to counter perceived stalling by aliens. Emphasizing these points, the Supreme Court held that a predecessor to § 1252(b)(1) did not accommodate late filings. *Stone v. INS*, 514 U.S. 386, 399–400, 405 (1995). Shortly afterward, and again to crack down on illegal immigration, Congress amended the deadline's text to be even more strict. Recognizing this, the Supreme Court reiterated one year ago that § 1252(b)(1) is "a *mandatory* claim-processing rule." *Riley v. Bondi*, 145 S. Ct. 2190, 2195 (2025) (emphasis added).

No matter, says the majority. According to it, the 30-day time limit incorporates a rebuttable presumption of equitable tolling, one that excuses years-long delay and undermines the finality of orders long after the fact. Because this conclusion ignores the text, context, and structure of the petition-filing deadline, as well as on-point case law from the Supreme Court, I respectfully dissent.[*]

---

[*] The majority begins by considering at length whether Navarro Cerritos's petition falls within our jurisdiction at all. Maj. Op. at 9-18. I am willing to assume, *arguendo*, that it does. In *Riley*, as here, the petitioner conceded removability and challenged a withholding-only decision, but the Supreme Court remanded without addressing that (Continued)

## I.

"[E]quitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014). The doctrine "is a traditional feature of American jurisprudence and a background principle against which Congress drafts limitations periods." *Boechler, P.C. v. Comm'r*, 142 S. Ct. 1493, 1500 (2022). We accordingly presume that federal limitations periods are subject to tolling. *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95–96 (1990).

But this presumption "is just that—a presumption. It can be rebutted, and if equitable tolling is inconsistent with the statutory scheme, courts cannot stop the clock for even the most deserving plaintiff." *Arellano v. McDonough*, 143 S. Ct. 543, 547–48 (2023). Immigration cases frequently elicit human sympathy. But immigration is also an area where, as the old adage goes, hard cases make bad law. The sole question before us is whether the 30-day time limit in § 1252(b)(1) accommodates any tardiness. Focusing—as we must—on its text, context, and structure, the deadline readily rebuts the presumption of equitable tolling.

## II.

Start with the text. § 1252(b)(1) gives us the 30-day time limit. Federal Rule of Appellate Procedure 26(b)(2) states that we "may not extend the time to file . . . a petition

---

jurisdictional bar, 145 S.Ct. at 2195, 2203-04, notwithstanding Justice Thomas's concurrence. *See id.* at 2204 (Thomas, J., concurring).

to . . . review an order of an administrative agency . . . unless specifically authorized by law." This prohibition overrides our general authority in Appellate Rule 2(a) to "suspend any provision of [the Appellate Rules]" for "good cause"; indeed, Rule 2(a) itself clarifies that it applies "except as otherwise provided in Rule 26(b)." Through this "conspicuous caveat," Rule 26(b) is "single[d] out" for "inflexible treatment." *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 715 (2019). As the First Circuit observed in rejecting another immigration petitioner's request for a "good-cause" filing extension, "[T]he unqualified language of Rule 26(b) . . . uniformly bars untimely petitions. We see no reason to introduce a disparity into the operation of a rule whose text does not contemplate it." *Goncalves v. Bondi*, 138 F.4th 58, 63 (1st Cir. 2025).

Navarro Cerritos has petitioned us to review an order from the Board of Immigration Appeals affirming the denial of his application for immigration relief. Everyone therefore acknowledges that his case triggers the strictures of Rule 26(b)(2), including the demand that any exception be "specifically authorized by law." Everyone likewise acknowledges that he filed his petition years after it was due. So where in the world have we been "specifically authorized by law" to get around the petition-filing deadline?

Neither Navarro Cerritos nor the majority can point to any positive law stating as much. Ordinarily, such authorization takes the form of "definite" text "[e]xplicitly set forth" in, say, a statute. *Specific*, American Heritage Dictionary of the English Language 1240 (1st ed. 1969); *see, e.g.*, 49 U.S.C. § 46110(a) (clarifying that a court may hear an untimely petition for review in the aviation context "only if there are reasonable grounds for not filing by the" deadline). There is no such expression here.

54

But the majority reads Rule 26(b)(2)'s narrow carveout ("unless specifically authorized by law") as broad as all outdoors, encompassing even a presumption of tolling based on the assumption that Congress legislates against a backdrop of common law traditions. *See* Maj. Op. at 24 (quoting *E.E.V.*, 2026 WL 1948859, at *17). Such a *general* presumption cannot possibly count as *specific* authorization. I can just as easily infer that Congress passed the current version of the petition-filing deadline with Rule 26(b)'s firm restriction on extensions of time in mind, considering that the Rule 26(b) restriction predated § 1252(b)(1) by decades. *Compare* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 306(a)(2), 110 Stat. 3009-546, 3009-608, *with* Fed. R. App. P. 26(b) (1968). After all, "[w]e generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988). This presumption is "perhaps especially" warranted for "the federal rules, which [Congress] reviews before implementation." *U.S. ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1176 (10th Cir. 2007).

Nor does Rule 26(b)(2) merit some special treatment because it is a rule, rather than a statute. In *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, the Supreme Court held that the deadline in Federal Rule of Civil Procedure 23(f) (for appeals from orders regarding class-action certifications) is mandatory based in part on Civil Rule 23(f)'s "unqualified" phrasing and in part on Appellate Rule 26(b)'s "express carveout" for extensions of time to petition for permission to appeal. *Id.* at 715. Crucially, the Court emphasized that we

55

"may not disregard a properly raised procedural rule's plain import any more than [we] may a statute's." *Id.* at 714.

And the relevant *statute*—§ 1252(b)(1)—certainly cannot provide that "specific" authorization Rule 26(b) demands. To the contrary, it says that "[t]he petition for review must be filed not later than 30 days after the date of the final order of removal."

This provision's inflexibility could not be clearer. Section 1252(b)(1) uses the word "must," which indicates an "oblig[ation] or require[ment]." *Must*, American Heritage Dictionary of the English Language 1160 (4th ed. 2000). That type of "strict, mandatory term[]" is "consistent with treating [the statute's] deadline as mandatory and not subject to equitable tolling." *Enbridge Energy, LP v. Nessel ex rel. Mich.*, 146 S. Ct. 1074, 1082 (2026). By contrast, many of the laws that the Supreme Court has identified as being subject to equitable tolling use less emphatic modal verbs, such as "may." *E.g.*, *Irwin*, 498 U.S. at 94–96; *Boechler*, 142 S. Ct. at 1497, 1500–01.

Section 1252(b)(1) is clear as a bell. Rule 26(b)(2) makes clear that we are not free to just ignore it. Stripping § 1252(b)(1) of its necessary context in Rule 26(b)(2), as Navarro Cerritos asks and the majority does, directly contravenes this clear instruction.

III.

The majority emphasizes how "mandatory language is not sufficient, on its own, to rebut the presumption of equitable tolling." *Enbridge Energy*, 146 S. Ct. at 1082; Maj. Op. at 20-21. True, but that does not render the utter textual clarity here secondary or irrelevant. All the other interpretive tools brought to bear in an equitable-tolling inquiry readily

56

support the strictness of § 1252(b)(1)'s text, confirming the unsurprising conclusion that it is mandatory.

## A.

Consider the deadline's context. Originally, the provision stated that "a petition for review may be filed not later than six months from the date of the final deportation order." Act of Sep. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 650, 651. This statute was enacted as part of a broader effort "to abbreviate the process of judicial review of deportation orders in order to frustrate certain practices . . . whereby persons subject to deportation were forestalling departure by dilatory tactics in the courts." *Foti v. INS*, 375 U.S. 217, 224 (1963). Unsatisfied with the results, however, Congress amended the language decades later in two material respects.

First, it halved the time limit to 90 days. Immigration Act of 1990, Pub. L. No. 101-649, § 545(b)(1), 104 Stat. 4978, 5065. Recognizing again that "every delay works to the advantage of the deportable alien who wishes merely to remain in the United States," Congress passed this amendment "principal[ly]" to "expedite petitions for review." *Stone*, 514 U.S. at 400 (quoting *INS v. Doherty*, 502 U.S. 314, 323 (1992)).

Second, just several years afterward, Congress decreased the time limit further to 30 days and replaced "may" with "must." IIRIRA § 306(a)(2), 110 Stat. at 3009-608. Here too, the amendment did not come about by happenstance; it was instead a meaningful part of the "new (and significantly more restrictive)" "judicial-review scheme" set forth in IIRIRA, which was "theme[d]" around "protecting the Executive's discretion from the courts." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 475, 486 (1999).

57

Indeed, these changes occurred just one year after the Supreme Court held that the preceding 90-day deadline could *not* be equitably tolled. *See Stone*, 514 U.S. at 398–400. If Congress took issue with reading this older version of the deadline so rigidly, surely it would not have proceeded to amend the statute to be even more inflexible.

"When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Id.* at 397. The majority disregards this principle twice over. Maj. Op. at 25. Shoehorning equitable tolling into § 1252(b)(1) contravenes the forcefulness conveyed by "must," reverting the word back to its more flexible predecessor "may." And as for the fine-tuning of the deadline's length, tolling doubly hinders Congress's decades-long intent to streamline the removal process and judicial review thereof. For one thing, it encourages tardy aliens to file petitions for review, even when they miss the deadline to the tune of several years. For another, it requires courts to entertain inevitably fact-laden (and typically destined-to-fail) requests to toll every time that a petition is filed late. How many more times must Congress amend its filing directives in immigration cases before courts sit up and take notice?

Against all this, Navarro Cerritos claims that equitable tolling makes sense in the immigration setting because aliens often lack the sophistication to ably challenge what may be harsh conditions in their country of removal. "But the nature of the subject matter cannot overcome text and structure that foreclose equitable tolling." *Arellano*, 143 S. Ct. at 552.

Nor do our policymakers share Navarro Cerritos's views. Time, time, and time again, Congress "aggressively" adjusted the petition-filing deadline *not* to accommodate unforeseeable and perhaps understandable delays, but instead "to expedite removal of

58

aliens" and promote finality in immigration proceedings. *Kucana v. Holder*, 558 U.S. 233, 249 (2010). Navarro Cerritos may believe the scheme would be better if it had more flexibility, but § 1252(b)(1) was drafted with other concerns in mind. These filing deadlines involve questions of pure policy, and, as such, it is not too much to ask that courts pay them some modicum of respect. I would not impose conflicting policy judgments over Congress's clear and longstanding intent.

## B.

The deadline's structure does not help Navarro Cerritos either. Observing how the 30-day limit has no explicit exceptions, the majority infers that Congress must have thought equitable tolling was available. Otherwise, the argument goes, it would have made at least a few carveouts for certain exceptional and sympathy-inducing circumstances. Maj. Op. at 21.

If that leap of logic were right, query why other deadlines in § 1252(b), regarding the filing of briefs, permit us to grant extensions "for good cause shown" and to forgive tardiness if "a manifest injustice would result." 8 U.S.C. § 1252(b)(3)(C). Those are the very factors we consider in an equitable-tolling inquiry. *See, e.g.*, *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000). Congress would not have felt the need to enact these exceptions if it thought equitable tolling was broadly available. Yet nothing in the majority opinion suggests why its reasoning applies solely to the petition-filing deadline and not also to the brief-filing ones. *See* Maj. Op. at 23.

That is a serious oversight. Not only do the petition-filing and brief-filing deadlines here both deal with immigration, wherein "[o]ur review . . . is not as a 'court of equity,'"

but they also both sit within the same statutory provision: § 1252(b). *United States v. Villaneuva-Diaz*, 634 F.3d 844, 852 (5th Cir. 2011). The majority thus cannot so hastily ignore our explicit authority to toll the deadlines for filing briefs in immigration petitions. After all, "[w]hen Congress includes particular language in one section of a statute [briefing] but omits it from a neighbor [filing], we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 143 S. Ct. 713, 720 (2023).

The better explanation for § 1252(b)(1)'s lack of exceptions is that Congress did not want them. Again, this deadline was last amended shortly after the Supreme Court held that it was mandatory. *See Stone*, 514 U.S. at 398–400. If Congress disagreed with the Court's reading and intended § 1252(b)(1) to have some equitable exceptions, it would have codified them in the statute. And it certainly knew how to do so, considering that the equitable exceptions to the brief-filing deadlines arose in the very same subsection of IIRIRA. *See* IIRIRA § 306(a)(2), 110 Stat. at 3009-608.

As explained at length, "[t]here is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" *Nken v. Holder*, 556 U.S. 418, 436 (2009) (alterations in original) (quoting *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 490). With that in mind, just ask yourself: In significantly restricting judicial review of removal orders for the express purpose of streamlining the immigration process, did Congress want courts to maintain an ill-defined power to excuse years-long delays in

60

seeking judicial review? Or did it want a policy where a 30-day filing period lasts for 30 days? Sometimes, the law really is that simple.

IV.

The majority's approach is particularly surprising given that we already have the answer key. As mentioned, the Supreme Court in *Stone v. INS*, 514 U.S. 386, addressed whether a predecessor to § 1252(b)(1)—specifically, the 90-day deadline that used "may" instead of "must"—permitted tolling. *Id.* at 388, 390. It answered in the negative, holding that "[t]he tolling rule's policy of delayed review would be at odds with the congressional purpose" of expedited judicial review. *Id.* at 400. One would think this intuitive conclusion rests on even surer footing today, considering that Congress amended the petition-filing deadline's text to be *more* emphatic shortly after *Stone*.

For confirmation, look no further than *Riley v. Bondi*, 145 S. Ct. 2190. There, the Supreme Court revisited its holding in *Stone*. But it did so only with respect to jurisdiction, asking whether the petition-filing deadline is "a jurisdictional requirement or simply a mandatory claim-processing rule." *Id.* at 2195. In other words, even if the time bar is no longer jurisdictional, the Court never questioned § 1252(b)(1)'s *mandatory* nature. That is the crucial point from *Stone*, and the point directly foreclosing Navarro Cerritos's petition in this case. "Mandatory" does not mean "advisory," and the last thing it provides is some sort of permission slip for petitioner to deviate from the statute's clear direction.

The majority largely ignores *Stone*'s answer key, citing the case only once. *See* Maj. Op. at 25. Instead, it makes much of the fact that the Sixth Circuit held, in light of *Riley*, that § 1252(b)(1) is subject to equitable tolling, and that the Seventh recently joined it. *See*

61

*Oxlaj-Perez v. Blanche*, 174 F.4th 516, 526 (6th Cir. 2026); *E.E.V. v. Blanche*, 2026 WL 1948859, at *18 (7th Cir. July 6, 2026); Maj. Op. at 19, 24-26. But of course, "[o]ur foremost job is to decide appeals correctly"—not blindly agree with whichever court weighs in first. *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1264 (11th Cir. 2025) (en banc) (Pryor, C.J., concurring).

And indeed, the Sixth Circuit was not even the first court to decide the matter before us. That honor goes to the Fifth, which "conclude[d] that § 1252(b)(1)'s thirty-day filing rule is a mandatory claim-processing rule that, if properly raised, must be enforced." *Liao v. Bondi*, 162 F.4th 519, 524 (5th Cir. 2025). True, the panel has since clarified that its holding rested on other grounds because the parties there did not raise the issue of equitable tolling. *See* On Pet. for Reh'g at 1 n.1, *Liao*, 162 F.4th 519 (No. 25-60427), ECF No. 138-1. But this does not render the panel's original analysis irrelevant; in fact, the Sixth Circuit explicitly recognized that its opinion departed from that of the Fifth, without using party-presentation principles to whitewash its disagreement. *Oxlaj-Perez*, 174 F.4th at 521, 526. And the Seventh, after describing the views of the Fifth and Sixth, explicitly chose the latter. *See E.E.V.*, 2026 WL 1948859, at *13. We should be no more wary of creating a circuit split than the Sixth Circuit was when it departed from the Fifth Circuit's decision, and no more wary of adding to that split than the Seventh Circuit when it did the same.

V.

This should have been a straightforward case. After repeatedly refining the bounds of judicial review in immigration petitions, Congress enacted a hard-and-fast 30-day deadline for the express purpose of accelerating the process. Every aspect of § 1252(b)(1)

shows it is mandatory, as explained in Supreme Court decisions that were faithful to Congress's intent. Because Navarro Cerritos blew past this deadline, we need not address the merits. I understand that courts are often drawn to equitable tolling out of fear of closing off a case whose merits might warrant relief. On the other hand, granting one claim of equitable tolling brings countless nonmeritorious equitable-tolling claims, even those 878 days late, in its wake. And it invites appellate courts to undo in granular detail long-completed, duly-conscientious, fact-intensive agency work. *See* Maj. Op. at 28-51. This snarls the immigration process and creates the very delays Congress wished to eliminate. Courts should not neuter the repeated efforts of a coordinate branch. I respectfully dissent.